## EXECUTORS OF R. OLIVER *vs.* PALMER AND HAMILTON.
### *December*, 1841.

The object of the Legislature by the first section of the act of 1820, ch. 161, was to provide a just, reasonable and expeditious mode of obviating the delays and difficulties to which complainants were subjected, by defendants disobeying the mandates of courts of equity, requiring them to appear and answer bills filed against them, so that in the event of the defendant's *continuing disobedience,* the complainant might have a remedy, as if an appearance and answer had in due time followed the order of the court.

The terms *ex parte* commission import, and the object of its issuing, as declared in the act of 1820, ch. 161, demonstrates, that it issues exclusively for the benefit of the complainant, and that he only under it is entitled to take testimony. It is issued to take testimony in support of the allegations in the bill.

Notice of the execution of such a commission, need not be given to the defendant.

So in cases under the act of 1820, ch. 161, sec. 1, the defendant is not entitled to notice of the time of taking the audit, it being exclusively made upon the proof on the part of the complainant.

At any time *before* final decree, if the defendant conforms to the *requisitions* of the law, and answers the complainant's bill, he is restored to all his privileges and means of defence, which are consistent with equity and good *conscience.*

Under an *ex parte* commission the defendant cannot cross-examine the complainant's witnesses; nor produce testimony for any purpose, nor can it be said *of the complainant's proof when returned under the commission,* that it is entitled to no greater weight than it would have been if taken after answer, denying all the allegations in the bill.

The complainant must offer such proof of the allegations in his bill, as would be exacted of him, if by the answer they were neither confessed nor denied.

When reviewing the decrees and orders of the Court of Chancery, *this court* is bound judicially to take notice of its general practice, and rules regulating the proceedings under which such decrees and orders were passed.

The act of 1820, ch. 161, was intended to enable a complainant to obtain a final decree in the same time that it could be obtained in the usual course, where the defendant had appeared and answered.

The third section of that act provides; that any defendant against whom an interlocutory decree shall be entered, under the provisions of the act, may appear and file his answer, &c., at any time before final decree—it contemplated an intervention of some reasonable time between the interlocutory and final decree.

Where a defendant files his answer, it is the practice of the Court of Chancery not to proceed to the passage of a final decree (but by consent,) until the commission returned has remained on file one entire term. The prac-

tice under the act of 1820, must conform to this. So the auditor's report must remain open and liable to exceptions, as in other cases.

The acts of 1825, ch. 117, sec. 2, and 1832, ch. 302, sec. 5, relate to all final decrees, as well those obtained under the act of 1820, as otherwise.

Where the proof taken in the cause shows he is entitled to relief in equity, the insufficiency of the averments of the bill can only be relied upon to defeat the claim, when excepted to under the act of 1832, ch. 302.

A conditional order drawn by *T* upon *R*, in favor of *P*, accepted payable when in funds, does not constitute a case for equity, because the funds had consisted of real property mortgaged, but which in fact at the time of filing the bill, had been sold and converted into money.

A bill for an insolated item, strictly legal in its character on one side, and three items of money had and received on the other, will not be sustained on the ground that it prays for an account.

*T* drew on *O* in favour of *P*., "out of any funds you may have belonging to me," for the sum of, &c. "after deducting all claims and demands you may have against me," (*T*) on "any account whatever. On the payment of the above mentioned sum, *P* will deliver you my two notes in favor of *D*, and relinquish all claims against me." *R* agreed to pay the same when he should be in funds, after paying himself first for the debt due by *T*, and about, &c., which *T* had drawn orders for." Held, that upon this acceptance an action at law could be maintained.

2. The words "on the payment" in the above order, do not constitute a condition precedent, but a condition of concurrent performance.

3. A decree founded upon the above order should be, that the defendant pay on delivery or tender of the notes, and release or deposit the money in court, to be paid over to the complainants on their filing in court the notes of *T*, and release to be delivered to the defendants. An absolute decree would be erroneous.

4. A bill founded on the above, should have tendered the notes in favor of *D*, and release, or offered to tender them. The law makes no presumption that they are in the hands of *P*, ready to be surrendered.

A bill of discovery should allege, that the facts of which the discovery is sought, are indispensable as proof to the complainant, and that he is unable to prove them except by the answer of the defendant.

The act of 1820, ch. 161, does not authorise a final decree upon bills of discovery, until the complainants, agreeably to the second section of that act, have obtained a decree *pro confesso* against the defendants.

The auditor's statement made upon proof in the record, if erroneous, should be excepted to under the act of 1825, or its errors will not as a general rule be reversed upon appeal.

A complainant in equity must allege in his bill, that he has done, or has offered to do, or is ready and willing to do, all that on his part is necessary to entitle him to the relief he seeks, or adequate reasons why he should be excused.

This court will not reverse the Chancellor's decree and pass a final decree

in cases where it is not satisfied that it has all the proof before it *to do full* justice between the parties.

Where a bill is filed to affect a fund, in which different persons have an interest, all the persons interested therein should be made parties.

APPEAL from the *Court of Chancery.*

The proceedings in this cause are partially reported *ante* 137, upon the motion to dismiss the appeal; but the court having decided to retain the cause, it is now reported with reference to the final decree.

On the 9th August 1837, the appellees filed their bill of complaint in *Baltimore* county court as a Court of Equity, against *Robert M. Gibbs, Charles and Thomas Oliver,* executors of *Robert Oliver,* the appellants, in which they state, that on or about the 18th June 1821, *Lemuel Taylor,* then of the city of *Baltimore,* being indebted unto them in a large sum of money, for money lent and advanced and paid by the complainants for him, drew an order in their favor for the sum of ten thousand dollars, on the firm of *Robert and John Oliver,* to be paid out of any funds they might have belonging to the said *Taylor,* after deducting all claims and demands the said *R. & J. Oliver* might have against him; that said order was presented to and accepted by the said *R. Oliver,* in the name of *R. & J. Oliver,* to be paid according to the tenor thereof, when the said *R. & J. Oliver* should be in possession of funds to pay, after deducting the amount of debt due to them at that time by the said *Taylor,* and the further sums for which previous orders had been given to other persons by said *Taylor,* on the said *R. & J. Oliver,* as stated by the said *R. Oliver,* and said acceptance was noted in a book belonging to said *R. & J. Oliver.* That before the time of making the said order, the said *Taylor* had assigned, transferred and conveyed to the said *R. & J. Oliver,* certain real and personal property, claims and demands to a large amount, (but which amount is unknown to the complainants,) to secure the said *R. & J. Oliver,* for the debt due by *Taylor* to them, and which the complainants understood from the said *R. Oliver,* would be amply sufficient when the whole should be collected, to repay

them, the said *R. & J. Oliver*, and the other orders so as aforesaid stated to have been drawn on them by the said *Taylor*, in favor of other persons, as well as the aforesaid order in favor of the complainants. That afterwards, *J. Oliver* departed this life, and subsequently, December 1834, the said *R. Oliver* also died, leaving a last will and testament, whereof he appointed the defendants, now appellants, executors, who have proved the same, &c. That the said *R. Oliver*, in his life time, although admitting the receipt of a large sum of money from the claim on the *Spanish* government, on account of the ship *Warren* and cargo, and from other sources—being a part of the property, claims and demands so assigned to them by *Taylor*, yet denied that it was more than sufficient to satisfy their own claim or debt due by *Taylor*, or was sufficient to pay any part of the debt due to the complainants, and refused to give any account of the debt due to the said *R. &. J. Oliver*, or of the previous orders to other persons, or of the true amount of the money so received by him. That since the death of the said *R. Oliver*, other large sums of money have been realized by his executors from claims under the *French* Indemnity Treaty, and other claims assigned as before stated. That the sums so received, were and are sufficient to pay and satisfy the amounts then due and owing to the complainants on account of the aforesaid order, after satisfying the said debt due from *Taylor* to *R. & J. Oliver*, and the other orders so given to other persons; and that sufficient assets have come to the hands of the defendants, as executors, to pay and satisfy the complainants. The bill alleged, that the complainant's debt was unpaid; that the executors after notice and demand being made on them by complainants, refused to pay them, or in any manner to account for the same. And the bill prays, that the defendants may shew the amount of the debt alleged to be due by *Taylor* to *R. & J. Oliver*, at the date of the order given by *Taylor* to, and in favor of the complainants. Also, the description, nature and value of the property, claims and demands so as aforesaid assigned by *Taylor* to *R. & J. Oliver;* and for an account, general relief and subpœna.

The order or draft addressed to *R. & J. Oliver*, directed them to pay the complainants "out of any funds you may "have belonging to me, (*Taylor*,) the sum of $10,000, after "deducting all claims and demands you may have against me "on any account whatever. On the payment of the above "mentioned sum of $10,000, *Palmer & Hamilton* will deliver to "you my two notes in favor of *D'Arcy & Didier* for $4,263.89 "and $4,288.19, and relinquish all claims against me.

"*Baltimore, 18th June,* 1821.    Signed,    LEMUEL TAYLOR."

The subpœna requiring the defendants to appear on the first day of September next, (1837,) was returned endorsed "*Summoned Omnes.*"

15th November 1837, an interlocutory decree was signed by his honor *Judge Purviance, A. J.* of *Baltimore* county court, and a commission directed to be issued, which was issued and returned.

*James Bosley*, a witness sworn on the part of the complainants, proved the making and delivery of the order on which the suit is brought, and at the time of delivering this order, *Taylor* admitted the debt due from him to complainants was a just debt, and that he was bound to pay it.

3rd. That immediately after said order was given to deponent as agent of the complainants, he presented the same to *R. Oliver*, at his counting house for acceptance; that the said *R. Oliver* then agreed to pay the same when he should be in funds, after paying themselves first for the debt due by *Taylor* to them, and about $9,000, which he said *Taylor* had drawn orders for.   *   *   *   That said *R. Oliver* further stated to deponent, that said *Taylor* was indebted to the said *R. & J. Oliver* in a considerable sum, but that he, *Taylor*, had given them large securities upon real and other property and claims, and that he, (*R. Oliver*,) had thought the real property or security would be sufficient to satisfy their claim; but that in consequence of the depreciation at that time in such property, *it* might fall short; but at all events not more than $10,000, which, with the $9,000 of orders preceding that of the complainants, would have to come out of the *Warren* fund, or claim

one of the assignments by *Taylor* to them, before the order of the complainants could be paid.

4th. That certain real property mentioned in complainants exhibit, being part of the real property conveyed by *Taylor* to *R. & J. Oliver*, was purchased by deponent of *R. & J. Oliver*, on the 25th March 1822, for the sum of 19,800, and the refusal of one of the executors of *R. Oliver* to pay the debt.

It will appear from the deed itself, that the conveyance of real property was made in trust to sell, for the purpose of re-imbursing to *R. & J. Oliver* the value of 225 shares of the capital stock of the *Bank of the United States* at the time of effecting such sale.

*Samuel Harris* for the complainants, proves, that on the 23rd March 1822, sales of said stocks were made at one hundred and ten dollars per share.

*David Hoffman* for the complainants, proves, that *R. Oliver* was admitted by the commissioners under the *Florida* Treaty, as a claimant on account of the ship *Warren* and cargo, to the amount of $50,000. That upon a final decree obtained by deponent for the seamen of the *Warren*, the amount recovered for them from all the assignees of the said fund which had been awarded by the commissioners under the *Florida* Treaty to said assignees, exceeded the sum of $40,000, and that upon the final adjustment of the portions to be paid by each of the assignees, it was found and admitted to be correct by the said *R. Oliver;* that he, as assignee, owed the seamen out of the amount so received by him, the sum of $17,636.09, which sum was paid by *R. Oliver* to deponent, on the 8th May 1832, and that as well as deponent remembers, the sum so paid him was somewhere about one-third of the entire sum awarded to *R. Oliver*.

*Charles A. Williamson* for the complainants, proves, that as paying officer in the *Union Bank of Maryland*, for the specific purpose of paying or settling the claims awarded under the *French* Indemnity Treaty, he paid to the executors of *R. Oliver*, between 16th June 1836, and 2nd April 1838, several sums of money, amounting in the aggregate to $15,762.69.

In answer to the libel of the seamen of the *Warren*, *R. Oliver* admits, that he received under the *Florida* Treaty, for the interest of *Taylor* in the *Warren* and her cargo, the sum of $58,594.72, which was duly carried to the *credit* of the said *Lemuel Taylor's* debt as aforesaid, and his account charged with the expenses thereon.

The deed of assignment of the schooner *Fawn* and cargo, from *Taylor* to *R. & J. Oliver*, dated 18th June 1821, and purporting to be made in consideration of $20,000, at or before that time paid.    It is upon this assignment, that under the provisions of the *French* Indemnity Treaty, the executors of *Robert Oliver* received the sum of $15,762.69.

At this stage of the cause, it was removed to the Court of Chancery on the 1st January 1839, &c.

8th January 1839, the cause was referred to the auditor with directions to state an account.

28th Jan. 1839, the auditor reported two accounts, A and B, in each of which he has ascertained and does so report, that there are funds in the hands of the executors of *R. Oliver*, out of which the order of *Taylor* in favour of the complainants ought to be satisfied.

In account B, which was adopted by the court, the auditor has charged the defendants as executors, with the gross amount of indemnity allowed by the commissioners under the *Florida* Treaty, for the loss of the ship *Warren* and her cargo, as before stated and received, 6th June 1826,     ⸱     $58,594 72

From this sum he has deducted:

1. For difference between the value of
   225 shares of stock in the *Bank
   of the United States*, and the pro-
   ceeds of sale of real estate which
   has been mortgaged or conveyed in
   trust to secure the same,     -     $4,950 00
   and interest thereon from the 25th
   March 1822, (the day of sale,) to
   8th June 1826,     -     -     -     1,249 87
2. For the amount of other drafts of

| | | |
|---|---|---|
| *Taylor* on *Messrs. Oliver,* which were entitled to priority, - | 9,000 00 | |
| and interest thereon from 18th June 1820, to 8th June 1826, - - | 3,240 00 | |
| 3. For re-payment on account of wages, &c. received by the crew of *Warren,* 17,636 96 | | 36,075 83 |

| | | |
|---|---|---|
| Making a balance in hand, 8th June 1826, of | | $22,518 89 |
| The claim of complainants is then stated: | | |
| For principal of order, - - - | | $10,000 00 |
| For interest thereon from 8th June 1826, to 25th January 1839, - - - - | | 7,578 33 |
| | | $17,578 33 |

On the 8th February 1839, (December term 1838,) the Chancellor (BLAND,) passed a decree ratifying the auditor's account B, and decreeing that the defendants pay "to the plaintiffs the sum of 17,578.33, with interest on $10,000, part thereof from the 25th day of January 1839, until paid, or brought into court, together with the costs of this suit, to be taxed by the Register."

From this decree the defendants appealed.

The cause was argued before ARCHER, DORSEY, CHAMBERS, and SPENCE, J.

By ALEXANDER and R. JOHNSON for the appellants, who contended—

1. That the proceedings in the cause have been irregular; that is to say, that notice of the opening and execution of the commission issued under the interlocutory decree was not given to the defendants; that the commission when returned did not lie a full term after its return in court; that the auditor's report did not lie during the first seven days of the term succeeding the day on which it was filed, and that the final decree was passed in vacation.

2. That neither the case stated in the bill, nor the case attempted to be proved, shew any title in the complainants to

the interposition of a court of equity. On the contrary, by their own shewing, they have ample remedy at law.

3. There is not sufficient proof of the receipt by *Robert Oliver* or his executors, of funds out of which the plaintiffs' claim could be satisfied, nor if such proof of receipt by *Robert Oliver* existed, would it be admissible under the pleadings in this cause.

4. That it is not averred or proved, that the complainants have fulfilled the conditions which were, by the order itself, to be precedent to the payment of the money decreed to them.

5. That the decree is erroneous in directing payment by the defendants below to the complainants below, without requiring the complainants below to fulfil the conditions which, by their own shewing, ought to have been precedent to any such payment.

6. That *Lemuel Taylor*, the drawer of the order sued on by the complainants, has not been made a party to the bill.

7. That the bill contains no prayer for the decree actually rendered, or for any decree.

In support of their appeal from the order dismissing their petition, they will insist—

That the proceedings shew a clear case of surprise, which entitles the aggrieved party to demand that the decree shall be opened to let in their defence.

And by NICHOLS, W. SCHLEY and DULANY, for the appellees, who contended—

1st. That the proceedings in the cause have been regular and according to law; and herein as to the specifications of the appellants:

1st. That the interlocutory decree in the case was signed by *Judge Purviance*, properly, legally, and with due warrant of law.

2nd. That the commission to take testimony was issued, opened, and executed legally, and according to due warrant of law.

3rd. That the final decree in the cause was legally, regularly and properly passed.

And they will further contend, that even if it should be determined against them, that these are irregularities, yet that it is now too late for the appellants to make the objections.

*2nd Point.*—The appellees will contend, that the case stated in the bill does show a title in the complainants to the interposition of a court of equity.

*3rd Point.*—The appellees will contend, that it is shewn by the pleadings and the proofs, that *Robert Oliver* in his life time received monies or funds, part of the property placed in the hands of *R. & J. Oliver,* as a security for their own claim, and that the appellants, the defendants below, received as executors of *R. Oliver,* other funds or monies, other part of the same property or securities in the hands of *R. Oliver,* for the purposes aforesaid; and out of these funds in the hands of the appellants, the claim of the complainants below ought to have been satisfied, and that there are assets in the hands cf the said appellants to pay it.

And the appellees will further contend, that it is now too late for the appellants to make this objection, they having filed no exceptions in the court below, either to the report and account of the auditor, or to the sufficiency of the averments in the bill; or demurred on account of duplicity or multifariousness in the bill.

*4th Point.*—The appellees will contend, that the bill contains all the averments necessary and proper to be made by the complainants, to entitle them to the relief sought by them, and decreed by the court below. And they will further contend, that this is an objection to the sufficiency of the averments of the bill, and not now to be taken by the appellants, no exceptions thereto having been filed by them in the court below.

*5th Point.*—The appellees will contend, that the decree is not erroneous in directing the payment of money by the defendants below to the complainants below, the complainants below having fulfilled all that was required, as shewn by their bill, to be precedent to such payment. But if overruled in this point, then they will contend, that this court will either

amend the decree in this particular, or pass such a decree as they shall think ought to have been passed by the court below; and then the appellees will further contend, that they ought to be allowed the additional interest from which they were debarred by the auditor's report and account; to which exceptions were taken by them in the court below.

DORSEY, J., delivered the opinion of this court.

The first ground which has been urged for the reversal of the Chancellor's decree is, that notice of the opening and execution of the commission issued under the interlocutory decree, was not given to the defendants. On the part of the appellants it is insisted, that when a commission issues under an interlocutory decree, passed in virtue of the act of 1820, ch. 161, sec. 1, it is executed in the same manner, the testimony taken under it to have precisely the same effect, as if the commission had issued, and the testimony been taken, after answer filed denying all the allegations in the bill, and general replication, and issue had been entered; and that the defendants had a right to appear before the commissioners, cross-examine the complainant's witnesses, produce and examine witnesses of their own, prove a receipt in full, or a release of the claim preferred by the bill, or give in evidence any matter of fact, which would defeat the complainant's right of recovery. To sustain the positions thus asserted, the appellants have referred to the case of *Purviance and Dorsey, administrators of Dorsey, vs Barton's administrator, 2 Gill & John.* 311, as decisive upon the subject. This case according to our interpretation of it, decides none of the principles which it is alleged to have settled, not one of the questions now before us were presented to the view of the court, or were by it designed to be decided. The only question which the court was there called upon to determine was, whether under the first section of the act of 1820, ch. 161, after an interlocutory decree, a commission issued, and testimony taken, the Chancellor must decree according to the testimony taken, or take the bill *pro confesso*, (as the Chancellor had done in that case,) and decree accordingly. And this court determined, that under the act referred to, the Chan-

cellor had no authority to take the bill *pro confesso;* and there-fore reversed his decree. It is true the court did reiterate the terms of the act of Assembly, but in reference to the afore-mentioned questions, they neither made, or contemplated ma-king any adjudication. On the other hand the appellees con-tend, that conceding to the case of *Purviance and Dorsey, ad-ministrators of Dorsey, vs. Barton's administrator,* all the effect which is computed to it, it has been clearly overruled by the case of *Grove vs. Fresh,* 9 *Gill & John.* 280. But for this construction of the court's opinion in *Grove vs. Fresh,* there is no foundation. None of the questions now presented were there brought to the view of the court, or considered by it, or intended to be adjudicated; no question as to the want of no-tice to the defendant of the time of taking testimony under the commission, or the making the audit, or as to the length of time the testimony thus taken should remain in the Chan-cery court previously to a final decree, or as to the time the auditor's statement must remain in court, liable to exceptions, was suggested or decided by the court, in either of the cases referred to. The only precipitancy attempted to be shewn by the proceedings in the case of *Grove and Fresh,* was in the passing of the interlocutory decree. There, after the return of the commission, it remained as long in the Chancery court previous to a decree, as in any case it could be required to re-main under any rule of the court.

Finding that we are untrammelled by any adjudged case, in deciding the questions raised on the true construction of the act of 1820, ch. 161, sec. 1, can the positions or any of them, hereinbefore asserted by the appellants, be sustained? In our opinion they cannot. The object of the Legislature in the section of the act referred to, was to provide a just and reason-ably expeditious mode of obviating the delays and difficulties to which complainants were subjected, by defendants diso-beying the mandates of courts of equity, requiring them to ap-pear and answer bills of complaint filed against them. The design of the enactment was in the event of the defendants continuing disobedience to the order of the court, to give to

the complainant a remedy against him, as nearly as may be, as expeditious and effectual as if an appearance and answer had in due time followed the order of the court. It certainly never intended to reward the defendant for his contumacy, by giving to him all the advantages he could have derived from the most favorable answer that could have been made, and at the same time denying to the complainant all the benefit he would have derived under an answer confessing the matters charged in the bill. Such a construction would hold out to defendants a reward for disobedience of the orders of the court, and deprive the complainant of his unquestionable right of drawing from the defendant an answer upon oath, to every allegation contained in the bill. According to our construction of the act of Assembly, we think the Legislature acted wisely and with justice to both parties, in authorising an interlocutory decree against a defendant refusing to appear or answer, and an *ex parte* commission to take testimony in support of the allegations in the bill. The terms *ex parte* commission import, and the object of its issuing, as declared in the act of Assembly, demonstrates, that it issues exclusively for the benefit of the complainant, and that he only is entitled to take testimony under it. It issues not for the taking of testimony generally in the cause, but in the language of the act of Assembly, for the taking of testimony to support the allegations of the bill. Why then should notice of the execution of the commission be given to the defendant? Indeed, to require it of the complainant would frequently impose upon him the continuance of much of the delay and difficulty which the act of 1820 was designed to obviate. For like reasons the defendant is not entitled to notice of the time of taking the audit, it being exclusively made upon the proof on the part of the complainant. Nor do we think a defendant has any reason to complain of being denied the privileges thus withheld from him. The moment he conforms, at any time before final decree, to the requisitions of the law, and answers the complainant's bill, he is restored to all his privileges and ordinary efficient means of defence, which are consistent with equity and

good conscience. Should he obstinately hold out and deny to the defendant the answer he is required to make, the disabilities under which he labours are the offspring of his own frowardness; a just visitation for his contumacy, and a necessary protection to the rights of the complainant. We deny then the doctrine so positively asserted on behalf of the defendant, that under the act of 1820, notice to the defendant is necessary to the execution of the *ex parte* commission, or that the defendant may cross-examine the complainants witnesses, or that under such a commission, he can produce testimony for any purpose whatever, (much less to prove a substantive matter of defence, which could only by his answer be made an issue in the cause,) or that the testimony under the the commission is entitled to no greater weight than it would have if taken in the ordinary way, after an answer denying all the allegations of the bill. A contrary determination would encourage defendants in withholding their answers; would enable them to raise issues on facts unsustained by their oaths, and would prejudice the rights of complainants in a way which no analogy or principle of a court of equity would sanction. It would impose on the complainants the necessity of proving every fact alleged in this bill, by two witnesses, or one witness and pregnant circumstances. Such a requisition under the act of 1820, which was made for the benefit of the complainants, surely cannot be seriously contended for. All that is required of the complainant is, that he offer such proof of the allegations in his bill as would be exacted of him, if by the answer they were neither confessed nor denied.

Having disposed of the questions raised by the appellants in relation to the execution of the *ex parte* commission and auditor's report, previous to their being returned to the Chancery court, we come now to the consideration of the objection raised to the final decree, by reason of its being passed before the commission had remained in court one entire term after its return, and before the auditor's statement had remained in court liable to exceptions during the first seven days of a term, as required by the rules of the Chancery court. To evade the

force of this objection, it has been insisted by the appellees, that the rules of the Chancery Court are not before us, and that we cannot judicially know what they are. It is true these rules are not in the record, but we conceive that when reviewing the decrees and orders of that court, we are bound judicially to take notice of its general practice, and rules regulating the proceedings under which such decrees and orders were passed.

By the act of 1820, ch. 161, the Legislature intended as nearly as it could reasonably be effected, to enable a complainant to obtain a final decree in the same time that it could be obtained in the usual course of the proceedings of the court, where the defendant had appeared and answered conformably to its commands; but not that the act should be used as an engine of surprise, injustice, or oppression; acting with such extreme precipitancy, that in the *five* first days under the *four* days Chancery rule, and without it the *two* first days of the term to which the subpœna is made returnable, the whole process of interlocutory decree, commission returned, auditor's report and final decree passed, might take place; and the defendant be irremediably fixed for the amount of the decree, although if an opportunity were offered him, he could demonstrate, that the averments in the bill were insufficient to support the decree; that every witness sworn under the commission was upon the face of the record incompetent; that all the testimony they gave, and all that was taken under the commission, was inadmissible; and that every item in the *auditor's* statement, even upon the testimony in the cause, was manifestly erroneous. If the doctrines contended for by the appellees be correct, and such decree were brought up for review by appeal to this court, with all its errors and inconsistencies staring us in the face, its affirmance could not be resisted. Did the language of the act of Assembly much more strongly than it does, warrant the interpretation put upon it by the appellees, we should hesitate long before we adopted it. But the nature of the evil intended to be remedied, and the language and provisions of the act itself, clearly repudiate this construction.

The design of the act was to relieve the complainant from the unjust and oppressive conduct of the defendant; not to make the latter the victim of the injustice and oppression of the former.

The *third* section of the act provides, that any defendant against whom an interlocutory decree shall be entered under the provisions of this act, may appear and file his answer, &c., at any time before final decree. This section of the act of Assembly was designed to reserve to the defendant an important privilege; it contemplated an intervention of some reasonable length of time between the two decrees. But if we regard it as communicating to the complainant the power of making the interlocutory and final decree occurrences of the same day, the reservation was little better than a mere mockery. The language of the *first* section of the act, with the obvious reasonableness and justice of the thing itself, appear to us to put the question now under consideration almost beyond the reach of argument. In stating the return of the commissions, and subsequent proceedings to be had thereon, it declares that the testimony taken and returned under them, shall have the same effect as if taken and returned in the usual way, on answer, general replication and issue, and the court shall proceed to a final decree in the cause in the same manner as if the defendant or defendants had appeared and put in their answers. Now in such a case the universal practice and rule in Chancery is, not to proceed to the passage of a final decree (but by consent of parties,) until the commission returned has remained on file during one entire term. If on return of the commission the case be referred to the auditor, there is the same reason that his report should remain in court, liable to exceptions, according to the Chancery rule upon the subject, that there is for any other audit so remaining. The Legislature never contemplated by the act of 1820, investing complainants with the power of obtaining snap decrees, finally adjudicating on the rights of defendants, without giving them a reasonable time, such as is allowed under the rules and practice of the Chancery Court, (of which the General Assembly

on this occasion must be presumed to have been cognizant,) to come in, answer and litigate, in the accustomed mode, the claims brought against them; or to shew the insufficiency of the averments in the bill; or that the testimony taken under the commission is from incompetent witnesses; or that it is inadmissible, or does not warrant the relief sought; or that the statement of the auditor is unsupported by the proof in the cause. To relieve complainants from the embarrassments under which they laboured, not to enable them to oppress or do injustice to defendants by surprise or precipitation, was the intent of the law.

That the General Assembly put the same construction upon the act of 1820 that we have done, we think may fairly be inferred from their passage of the acts of 1825, ch. 117, sec. 2, and of 1832, ch. 302, sec. 5, which embraced all final decrees; as well those under the act of 1820 as those otherwise obtained. Upon no other hypothesis can we reconcile those enactments to that prudence, liberality and justice, which must ever be imputed to enlightened legislation.

The *second* point of the appellants is, "that neither the case stated in the bill, nor the case attempted to be proved, shew any title in the complainants to the interposition of a court of equity. On the contrary, by their own shewing they have ample remedy at law." To escape from this objection the appellees have insisted, that even if their bill be too artificially drawn, by reason of an insufficiency in its averments, to entitle them to the relief they have sought, yet that the proof in the cause having clearly established their right to the interposition of a court of equity, the appellants are by the fifth section of the act of 1832, ch. 302, precluded from urging as a ground of reversal, any such defect in the bill. And if their assumption of the efficacy of the proof offered be correct, we entirely concur in the position they have assumed. Being of opinion as before stated, that not only by the broad and explicit language of the acts of 1825, ch. 117, sec. 2, and 1832, ch. 302, sec. 5, are final decrees under the first section of the act of 1820, ch. 161 embraced, but that upon the soundest princi-

ples of equitable jurisprudence they ought so to have been. Does the proof shew a case entitling the appellees to relief in equity, is the matter to be inquired into? They allege themselves so entitled, because they were pursuing mortgaged premises which they could reach in no other way than through a court of equity. To this assertion the proof in the cause gives a conclusive negative. It shews, that long before the institution of this suit, the mortgaged premises had all been converted into money, which the appellees could without difficulty have reached by an action at law, either for money had and received, or a special action on the case, on the order of *Taylor* accepted by *Oliver*. It is also insisted, that the bill must be sustained because it prays for an account. Under that head of equity jurisdiction, we think the present bill cannot be supported, the proof in the cause not shewing long or complicated accounts on both sides; but an isolated item, strictly legal in its character, on one side, and three items of money had and received by the appellants, out of which it is alleged that the claim of the appellees ought to have been paid. See *Frietas and al. vs. Dos Santos and al.* 1 *Young and Jarvis,* 574, *and King vs. Rosset and al.* 2 *Young and Jarvis,* 33.

But it is urged, that the appellant's claim against *Taylor* having a priority of payment out of the moneys received, the appellees could not proceed at law, from an inability to prove what was the complainant's claim. This difficulty we conceive existed but in the imagination of the appellees. After they had proved the amount of moneys received, the *onus* of proving the amount of the appellant's priorities, we apprehend was then thrown on them. It has been urged too, that the amount received by the appellants, to the extent of the appellee's claim, was money had and received by the former to the use of the latter, and that therefore a bill in equity would lie for its recovery. But this court has decided in the case of *Adair vs. Winchester,* 7 *Gill & John.* 114, that where the remedy at law in an action for money had and received is clear and ample, that a bill in Chancery will not lie.

It has also been contended, that the order drawn by *Taylor*

on *Robert and John Oliver*, rendered them trustees of the fund, and in its collection, agents of the appellees to the extent of their claim; and in both of those characters liable to be sued in equity. It is true that Courts of Chancery have gone great lengths in converting legal liabilities into *quasi* trusts and constructive agencies, where the ends of justice would be promoted thereby, and where no adequate relief could be obtained at law.    And within the scope of the authority thus exercised, under some circumstances, and for the purpose of giving relief, where no legal remedy existed, a Court of Chancery might regard the order given by *Taylor* as an assignment and holding in trust *pro tanto* of the funds in *Oliver's* hands, on the condition mentioned in the order.    As if for example, the *Olivers* had refused to accept the order, and *Taylor* were insolvent; or if the estate of the *Olivers* were inadequate to the payment of their debts, and this fund could be traced specifically in the hands of their representatives, it would be treated as thus assigned and held in trust, notwithstanding the acceptance, and the appellees could reach it through the interposition of a court of equity.    But in the case before us, the necessity and ground-work for such an equitable fiction does not exist, and consequently it cannot arise.    *Oliver* has accepted the order; his estate is amply sufficient for its payment, and the appellees remedy at law was appropriate, easy and complete. If in a case like the present, where the claim asserted is strictly legal in form and substance; where the remedy at law is expeditious and ample, you grant to a court of equity the *power* ascribed to it, upon the principles upon which it is claimed, there is scarcely a case resting in contract, and now cognizable in a court of law, which may not be drawn into the vortex of Chancery jurisdiction.

To sustain the decree of the Chancellor it has also been asserted, that this is a bill of discovery; and although the complainant's claim be in its nature exclusively cognizable at law, yet that the Chancery Court, for the purpose of the discovery, having obtained jurisdiction over the case, is competent to give full and final relief upon the whole subject matter.    The de-

cree cannot be supported on this ground, for various reasons; but few of which do we deem it necessary to state. In the first place the bill has neither the form or substance of such a bill of discovery. It does not allege, that the facts of which the discovery is sought, are indispensable as proof to the complainants, and that they are unable to prove them by other testimony. And secondly, the act of 1820, ch. 161, authorises a final decree in no such case, until the complainants, agreeably to the second section of that act, have obtained a decree *pro confesso* against the defendants, which has not been done. See 1 *Story's Eq.* 91, *and Brown vs. Sivan,* 10 *Peters,* 502.

The appellants *third* point, if supported by the proof in the cause, forms no ground for the reversal of the Chancellor's decree confirming the auditor's statement. That statement is made upon the proof in the record; and if erroneous, the errors must by exceptions be brought before the Chancellor for his decision thereon, and if not so excepted to, by the act of 1825, ch. 117, sec. 2, no advantages can be taken thereof in the Court of Appeals.

The appellant's *fourth* point is, that it is not averred or proved, that the complainants have fulfilled the conditions which were by the order itself to be precedent to the payment of the money decreed to them. We cannot agree with the appellant, that the condition specified in the order was a condition precedent, to be complied with on the part of the appellees before any demand of payment could be made. We regard the word "*on*" in the order, as a condition of concurrent performance; the acts dependent thereon, are neither to be performed before or after the payment of the money, but simultaneously with it. If neither party, reposing confidence in the other, see fit first to perform their part of the contract, the money should be produced and counted under the eye of the person to receive it; the notes produced with the release signed, and both inspected by the person to whom they are to be delivered; and the payment of the money and delivery of the notes and release, should be simultaneous acts, without precedence in either; and should a decree be passed to enforce

the execution of the contract, it should be, that the defendant pay on delivery or tender of the notes and release; or that the defendants deposit the money in the Chancery Court, to be paid over to the complainants on their filing in court, to be delivered to the defendants, the notes and release aforesaid. If such should have been the substance of the decree in this cause, the complainants on the face of their bill must shew, assuming the truth of its allegations, that they are in a condition to entitle themselves to such relief. It is also one of the oldest and soundest principles of equity, that he who goes into a Court of Chancery invoking its interposition in his behalf, must allege in his bill, that he has done, or has offered to do, or is ready and willing to do, all that on his part is necessary to entitle him to the relief which he seeks; or he must set forth adequate reasons why he should be excused from doing so. Every word in the present complainant's bill may be true, and yet they have no claim to the aid of a court of equity. To entitle them to demand payment of the order in question, they must not only be ready to execute the requisite relinquishment, but must have delivered up, or offered to deliver up, or be prepared to deliver up, the two notes specified in the order. This they have no where either alleged or proved that they ever have done, or ever were in a situation to do; or that any reason exists why they are exempt from the necessity of so doing. No safe presumption can arise that the notes are now, or ever were in the possession of the appellees. They were drawn by *Taylor* in favour of *D'Arcy and Didier*, and *non constat*, that they are not now the holders thereof; or that the notes are not now in the possession of *some bona fide* holder, a stranger to these proceedings. But it has been argued as an apology for these defects in the bill and proof, that the surrender of these notes is of no benefit to *Taylor*, they being long before the filing of the bill or rendition of the decree, barred by the statute of limitations. The answer to this argument is, that the complainants had no right, by violating their contract, to impose on him the necessity of pleading limitations to a debt which he knew had not been paid. And even if they had the right to do so, how

does it satisfactorily appear to us that such a plea could avail him? For aught that we know, a short time before the filing of the bill or passage of the decree in this case, *Taylor* may have acknowledged the existence, or promised the payment of this just debt, knowing it had never been paid.

These objections to the relief which the complainants have obtained in the Chancery Court, it is said cannot arise in this court, since the act of 1832, ch. 302, sec. 5, which forbids the reversal here of any decree by reason of the insufficiency of the averments of the bill, unless an exception thereto be raised in the court below. The answer to this is obvious. The objection of the appellants is not alone to the insufficiency of averments, but to the total absence of all proof necessary to establish them, had they been properly made in the bill. Neither in terms, nor by intent, have the Legislature, by the act of 1832, given an efficacy to proof offered under defective pleadings, to which it would not have been entitled had the pleadings been perfect. But no latitude of construction which can be given to this section of the act of Assembly, will enable the complainants to eke out a case from the record before us, in which the decree in their favour can be sustained. Concede for the moment that the bill contains all the averments, of the absence of which the appellants have complained, and that in the record there is all the proof requisite to sustain such averments, can the decree of the Chancellor even then be supported? Assuredly not. It enjoins payment by the appellants of the amount of *Taylor's* orders in favour of the appellees, without requiring of the latter the performance of any part of the condition on which their right to demand, and the obligation or authority of the appellants to make the payment, were by the express terms of the order made to depend.

To remedy this defect in the decree the appellees insist, that it should not be reversed but be affirmed, with such an addition thereto as should have been made to it at the time of its passage. Tis true, this court may do so, if thereby the purpose of justice would be subserved. But we do not believe that such ends would be accomplished by an affirmance of the

present decree in the manner suggested. Such a procedure would deprive the appellants of all opportunity of defending themselves against the claim of the appellees, in the accustomed mode in which the rights of parties litigant are adjudicated in Chancery, (which system of adjudication is founded on the broad principles of equity and justice). And would, as is apparent from the record, do great injustice to the appellants, inasmuch as by the Chancellor's decree, the appellant's intestate is charged with the whole amount awarded to the *Olivers* as owners of the ship *Warren* and cargo, without any deduction or allowance by way of commission or otherwise for the intestate's services in prosecuting the claim, or for his expenditures incurred in procuring the necessary documents and proofs to substantiate it, or for counsels or agents fees necessarily accruing in the prosecution thereof. The existence of such disbursements and charges, we think we may fairly assume, from our knowledge of facts of universal notoriety in relation to such claims, and which appear by the answer of *Robert Oliver* in *the District Court of the United States* for the *Maryland District*, given in evidence by the appellees. And further, it would appear by the testimony of *John Thomas*, that the assignments made to *Robert and John Oliver* were not merely to secure them for the debt due on account of the two hundred and twenty-five shares of *United States Bank Stock*, mentioned in the deed of trust, but in the language of the witness, "for advances and money paid by the said *Robert and John Oliver* for the said *Lemuel Taylor*." For none of which advances or payments, except for the two hundred and twenty-five shares of stock, does the decree of the Chancellor give any credit to the appellants. To affirm it therefore, in the mode proposed, would be against equity and conscience. The opinion of this court upon the appellant's *fifth* point, is fully disclosed in the views it has expressed on their fourth point.

The appellants sixth objection to the affirmance of the Chancellor's decree, (conceding this to be a case for the interposition of a Court of Chancery) is, we think, well taken. It is a fundamental rule of equitable jurisprudence, to the universality

of which the case before us forms not one of the exceptions, that where a bill is filed to affect a fund in which different persons have an interest, all the persons interested therein must be made parties, *ut finis sit litium,* that a multiplicity of actions may be avoided. That *Lemuel Taylor* was interested in the fund now in controversy, is not only apparent from the bill of complaint and proofs in the cause, but by the auditor's statement, confirmed by the Chancellor's decree, which shews a large balance due him, after satisfying all the other claims, even without embracing in the audit, the proceeds of the *Schooner Fawn,* and her cargo. For the payment of which balance, had he been a party, either complainant or defendant, he would have been entitled to a decree, and would have been forever precluded from claiming any other or greater sum on account thereof from the representatives of *Robert Oliver,* who would thus have been protected from all further litigation on the subject. But as the case now stands, none of the rights of *Lemuel Taylor* have been adjudicated. A new field of litigation is open to him and the appellants; and in their controversy every thing decided in this case may be repudiated and set at naught, and the Chancellor may be compelled to sign a decree, utterly inconsistent in every particular with that now before us. Against such multiplied and vexatious litigation, and inconsistent adjudications, the appellants have upon the best established principles of equity, a right to be protected; and to obtain that protection may insist, that all persons interested should, before any decree in the cause, be made parties thereto, that their interests in the fund may be fully and finally adjusted.

The appellant's *seventh* point we deem it unnecessary to examine, its occurence not being probable in any future case, and enough having been already determined in the consideration of the preceding points to settle the fate of this appeal.

The court will sign a decree reversing the decree of the Chancery Court, and dismissing the appellees bill of complaint, but without prejudice to his legal rights, and without costs.

**DECREE REVERSED.**