HENRY D. HATTON *vs*. WILLIAM L. WEEMS.—*Dec.* 1841.

When the court is divided upon a motion to dismiss an appeal, the motion does not prevail.

Under the act of 1820, chap. 161, a final decree is irregular, and liable to be reversed on appeal, unless before the decree, the commission had lain in court, one entire term.

It is the practice of the Court of Chancery when the defendant appears and answers, and the case brought to an issue, the commission, after its return, lies one whole term before the cause is ready for a final decree.

The terms of the court commence and terminate on certain days; and a term comprises the whole intermediate period.

Hatton *vs.* Weems.—1841.

At each term of the Court of Chancery there is a specified period denominated its sittings; as at December term, the sittings commence with the commencement of the term, and end on the third Tuesday of January next ensuing; a cause ripe for decree may be called up and argued or submitted, at any time during the sittings, but not after the sittings are over, except by consent.

Where the rule security for costs is entered on the docket irregularly, the Chancellor cannot be called upon to enforce it.

Where the non-residence of the complainant appears on the face of the bill, the rule security for costs may be laid on the docket during the sittings of the court.

Where the non residence of the complainant does not appear on the bill, the question of security for costs must be brought before the court by petition, and a special order obtained.

A defendant in default for not appearing and answering a bill, while in default, cannot lay the rule security for costs.

A prayer of appeal is a waiver of the right to demand security for costs.

Any proceeding in a cause recognizing the complainant's right to sue, takes away the defendant's right to have security for costs.

When the right to ask security for costs is once waived or abandoned, the filing of a supplemental bill of revivor by an administrator, does not revive that right.

H. devised in 1822 to his son and his heirs, a tract of land, in trust, to permit the testator's daughter to have all the rents and profits arising therefrom during her natural life, and after her death to her children lawfully begotten, but if she should die without lawful issue, then I give and devise the said land to my said son and his heirs forever: Another item of the will devised various slaves, male and female, "on the same terms," the testator had given the land, and another clause gave also on same terms, one-half of his stock, plantation utensils, and household and kitchen furniture. The testator gave the residue of his estate to his said son, whom he also appointed his executor.

Held under this will—

1. That the daughter took an equitable estate tail, which in this State is converted into an estate in fee, in the lands devised to her.

2. That in the personal property she took an absolute estate.

3. That the limitation over to the son being after an indefinite failure of issue, is void.

4. That the bequest being of both male and female slaves, and the testator intending that all should go over on the same event, the character of the subject matter of the bequest, as in the case of Briscoe *vs.* Briscoe, 6 Gill & John. 232, does not make the limitation over valid.

A guardian cannot incroach on the capital of his ward's estate without the order of the Orphans court, nor can the real estate of the ward be diminished, but by the approbation of the Court of Chancery.

Hatton *vs.* Weems.—1841.

A trustee ought not to encounter expenses, impairing the principal of c. q. t. estate, without the approbation of a Court of Chancery.

Expenses which a trustee must necessarily encounter, and which can be clearly and satisfactorily seen by the court, ought to be allowed, as the court on application at the proper time would have allowed them.

If a trustee has mixed trust property with his own : kept no accounts of the produce of the labor of slaves held in trust, nor of their clothing and maintenance, nor of the clothing of his c. q. t.; then by reason of his own misconduct and negligence, he is liable to have his expenses set down at their lowest estimate.

When it was in question what allowances should be made a trustee for raising infant slaves, and the same estate had been under the care of a receiver of the court, when similar expenses had been incurred, the court as against a delinquent trustee who has kept no account, considered the actual disbursements of the receiver as furnishing a better guide to truth and justice, than an average of the opinions and estimates of witnesses, of what, in their judgments, would be a fair price.

The Chancery Court for attaining justice, where the record furnishes no other means of arriving with more certainty at the truth, will average testimony of values; but this rule has exceptions, and is not of universal application.

The opinions of persons accustomed to furnish boarding and lodging, is of more value than opinions estimating the value of such services without actual experience; neither, however, is conclusive, but the court will consider the relation of the parties, and other circumstances, as between trustee and c. q. t.

A trustee, under circumstances, allowed the whole income of his c. q. t. for board and maintenance, and taking care of her real and personal estate; and also in analogy to executors and administrators, was allowed commissions on the products of real estate, and on the income of the personal estate, and the value of the latter as it came to his hands.

By the act of 1798, chap. 101, the right of a surviving husband to sue for the personal estate of his deceased wife is conferred, just as if he had administered upon her estate.

When the assets are in *Maryland*, the right to sue exists, though the wife may have died in another State.

Marriage and issue born alive, entitle a surviving husband to recover the personal property, and the rents and profits of the lands of a deceased wife.

Where the court has to modify and reform a decree, and each party has to some extent succeeded, each party should pay their own costs in this court.

CROSS APPEALS from Chancery.

On the 21st December, 1832, *William L. Weems*, and *Mary* his wife, filed their bill in Chancery, alleging that *Henry Hatton*, father of *Mary*, departed this life in the year 1824, having devised to his son, the appellant, one hundred and fifty acres

of land, whereon the testator then dwelt, a number of negroes by name, and also one half of his stock, plantation utensils, household and kitchen furniture, all which were so devised in trust for the said *Mary*, and to permit her to have all the rents and profits arising therefrom, in the manner stated in said will, which was exhibited with the said bill; that appellant was appointed executor of said will, and gave bond as such, for the payment of debts and legacies, and of course has returned no inventory which would enable the said *Mary* to ascertain what her estate was; that appellant has been in the possession of the property left him in trust, made crops on the land, employed the negroes on his own farms, made thereby large sums of money, rendered no accounts, and refuses to account; that he has cut down and applied to his own use, large quantities of timber growing on the said lands, taken away some of the houses thereon, and in violation of his trust, sold some of the negroes, and claims to retain them all. Prayer for an account—appellant's removal from the trust; delivery up of the whole of the trust property, and for general relief, &c.

The will of *H. D. Hatton*, exhibited with this bill, was dated 7th September, 1822, and admitted to probate on the 15th November, 1824. It devised as follows:

"*Item.* I give and devise to my loving and faithful son *Henry D. Hatton*, for the trusts hereinafter mentioned, one hundred and fifty acres of land, whereon I now live—beginning at, &c., to hold the same to the said *Hatton*, and his heirs in trust; that he permit my loving daughter, his sister, *Mary R. Hatton*, to have all the rents and profits arising therefrom during her natural life, and after her death, to her children, lawfully begotten; but if she should die without lawful issue to heir the above mentioned land, then and in that case, I give and devise the said land to my beloved son *Henry D. Hatton*, to him and his heirs forever.

"*Item.* I also give in trust to my faithful and loving son, *Henry D. Hatton*, for my loving daughter, his sister, *Mary R. Hatton*, on the same terms that I have given the aforesaid one

hundred and fifty acres of land, the following negroes, namely: *Frank, Hendley,* &c., &c.; *Rose, Kitty, Matilda,* &c., twenty in all, and their increase; also *Kitty's* children and *Matilda's* child.

"*Item.* Also one half of my stock, plantation utensils, and household and kitchen furniture, I give in trust to my said son, for my said daughter, in the same manner as the aforesaid land and negroes.

"*Item.* It is my wish and desire, that my said loving daughter, and the aforesaid property, should be under the immediate protection, care and direction of her loving, faithful brother, *Henry D. Hatton.*

"*Item.* I give and devise to my loving and faithful son *H. D. H.* all the residue of my property, real, personal and mixed, of every description, to him and his heirs and assigns forever, and constitute him executor of this, my last will and testament, &c."

At September term, 1833, the 2nd October, 1833, the appellant having appeared by counsel and failing to answer, the Chancellor ordered a commission to *Prince George's* county.

On the 31st October, 1833, the defendant *H. D. H.* filed his answer, admitting his father's will, as exhibited with the bill of complainants, and after stating the particulars of the cattle, stock, household and kitchen furniture, and plantation utensils, of which his father died possessed, denied the sale of any of the trust negroes; that the expenses and trouble of the negroes were worth more than their actual profits, nearly all of them being very old, very young, or breeding women. The answer then detailed the names and ages of the servants at his father's death, and of those since born, and alleged he had greatly improved the land, and had cut down no timber trees, but only some shade trees, which he used; that he had removed some old houses and put improvements of more value on the land; that if justice be done, his sister is his debtor, and not he her's; that she is not entitled to receive at his hands one cent on account of moneys due her by this respondent, before her intermarriage with the other complainant; that he

is entitled to charge his sister for her board, clothing and other necessary expenses, from the death of her father to the time of her marriage in 1832, and that five hundred dollars per annum during said term, considering the style in which his sister was supported by the said appellant, would be a very moderate allowance.    The answer then claimed compensation for the defendant's labor, &c., as trustee, and for reasons assigned, suggested that the property ought to be sold and invested under the Chancellor's orders, securing to the appellant his contingent rights, in conformity to the will of his father; and finally denied all violations of duty as trustee.

This answer was received by consent, the evidence taken, and to be taken under the *ex parte* commission, to be read as if the commission had been issued after the answer was filed.

Upon the 24th February, 1834, and on the petition of the complainants, that the defendant had not completed the taking of his evidence under the commission; that he had wantonly injured and wasted much of the trust property, and that in his hands it was in danger of further and irreparable injury; that the complainant's claim against the defendant, was already considerable, and his ability doubtful; that while he retains possession of the trust estate, he will be anxious to postpone its settlement, and that before as well as since the filing of the bill, defendant has shown every disposition to injure the estate—verified by affidavit.    The Chancellor (BLAND) appointed a receiver to take possession of the whole estate, after giving bond.    The bond being given on the 16th March, 1834, the defendant *Hatton* answered the aforesaid petition, and denied its several allegations of misconduct and apprehended injury; and after notice of a motion to discharge the receiver, founded upon the defendant's answer, the Chancellor, on the 29th March, 1834, (no one appearing for the plaintiff against the motion,) rescinded the order appointing a receiver.

On the 2nd May, 1834, second commission to take proof was issued by consent, and on the 14th August *Hatton* petitioned for an order to sell certain negroes, on the ground that they had become refractory, ungovernable, and disposed to run

away; that some had run away, and some were now in jail for safe custody; this petition was verified by affidavit. The Chancellor ordered a publication of the nature and object of the petition. Upon the 17th March, 1835, the first commission (to *G. L. Magruder, Esq.*,) and the second (to *William H. Tuck, Esq.*,) were returned executed, with a great variety of proof. On the 15th June, 1835, by agreement of parties, the cause was submitted to the auditor to state an account or accounts, between the parties, forthwith, to be reported to the Chancellor, subject to exceptions, and reserving all equities; which agreement the Chancellor confirmed. On the 24th July, 1835, the Chancellor authorised *Hatton* to sell certain of the negroes, as prayed for by him on the 14th August, 1834.

On the 21st July, 1837, *W. L. Weems,* by petition, suggested the death of his wife *Mary,* leaving issue an only daughter *Mary Ann Weems;* that the daughter is also dead; that petitioner has taken out letters of administration upon his daughter's estate, from the Orphan's court of *Prince George's* county; that upon the true construction of the will of the said *H. D. Hatton,* the elder, his daughter *Mary R. Hatton* became entitled to an equitable estate tail, in the property devised and bequeathed to her, and that the limitation thereof over to the defendant *Hatton* is too remote, and consequently void; and that the whole estate vested absolutely in the said *Mary R. Hatton;* that upon the death of his said wife, he, this complainant, became entitled in his own right, and absolutely, as surviving husband, to the whole of the personal estate so bequeathed to her, with the increase of the same, and to claim and recover the possession thereof from the defendant *Hatton,* and to an account of, and decree for the rents, issues and profits thereof, as well those which accrued in the life time of his wife, as those which accrued since; and that he is in like manner entitled to an account of, and decree for, the rents, issues and profits of the real estate, so as aforesaid devised to his said wife, and that he is also entitled as tenant by the courtesy. Prayer in conformity.

12    v. 12

Upon this petition the Chancellor (BLAND,) on the 25th July, 1837, ordered as follows, viz :

I am of opinion, that the word *"children"* and the word *"issue,"* as used in the will of *Henry Hatton,* deceased, must be taken to be words of purchase, and that his daughter *Mary R. Hatton,* took no more than an estate for life, in the real and personal estate given to her, with a contingent remainder over, of a fee simple estate in the lands, and of an absolute estate in the personalty to her children, and with a similar contemporary remainder to *Henry D. Hatton,* and that consequently by the death of the plaintiff, *Mary R. Weems,* the case abated, and the bill became defective.   It is stated in the petition that *Mary R. Weems* died leaving a child, the fruit of the marriage with the plaintiff *William L. Weems,* which child is also dead. It is therefore ordered, that this cause stand over with leave to file a supplemental bill of revivor, in such manner and form as may be deemed necessary and proper.

Upon the 29th July, 1837, *William L. Weems,* administrator of *Mary Ann Weems,* late of *Hickman* county, in the State of *Tennessee,* filed his supplemental bill of complaint and bill of revivor, referring to the previous proceedings in the cause, the facts of his petition of 21st July, 1837, and the order thereon.   Prayer that *Henry D. Hatton* may answer; that the bill may be revived; for the removal of *H. D. H.* from the trust; account and surrender of the property, &c., and for relief according to petitioner's rights, as they shall be ultimately determined to exist, in any, either, or all of the capacities in which he claims or has claimed, &c.

On the 30th September, 1837, the defendant *Henry D. Hatton,* having been summoned and not appearing to answer the bill of revivor, the Chancellor decreed that the complainant was entitled to relief, and ordered a commission to take testimony to *Samuel A. Baker,* in *Hickman* county, *Tennessee.* The commission was returned on the 20th November, 1837, executed, and at December term 1837, the Chancellor (BLAND,) passed the following order :

"In this case an interlocutory decree having passed on the

30th September, 1837, in consequence of the failure of the defendant to appear or answer according to the rules of the court, and a commission having issued according to the act of Assembly, to enable the complainant to prove the allegations of his bill, and the said commission having been returned, and the cause standing ready for hearing, and being submitted on the part of the complainant, the bill and proceedings thereupon were by the Chancellor read and considered.   It is thereupon, this 19th day of January, 1838, by, &c., decreed, that the said *H. D. Hatton* deliver up and hand over to the complainant, the following negro slaves, bequeathed by the said *Henry Hatton* to the said defendant, in trust, for *Mary R. Hatton*, the late wife of the complainant, that is to say, *Frank, Hendley,* &c. &c., and the increase of the females, born since the death of the said testator *Henry Hatton,* and *Kitty's* children and *Matilda's* child, together with one half of the stock, plantation utensils, and household and kitchen furniture of the said testator *Henry Hatton.*   And it is further, &c., decreed, that the said defendant account with the said plaintiff, of and concerning the rents, issues and profits of the real estate, devised by the said testator, to the said defendant, in trust for the said *Mary,* the late wife of the said complainant, from the period of the death of the said testator, to the death of the said *Mary R.,* and from the death of the latter to the death of the said *Mary Ann Weems,* the intestate of the complainant; and that he account in like manner with the said complainant, for the hire and profits of the aforesaid negroes, and the increase thereof, and for the other personal property bequeathed to him, the said defendant as aforesaid, in trust, for the use of the said *Mary, &c.,* from the pleadings and proofs now in the cause, and such other proofs, as may be hereafter taken in the usual manner; and for the purpose of taking said accounts, this cause is referred to the auditor, with directions to state the necessary accounts."

From this decree the defendant prayed an appeal, but gave no appeal bond, the penalty of which had been prescribed by the Chancellor at $10,000.

On the 3rd February, 1838, the defendant filed a petition praying that the decree of the 19th January, 1838, might be rescinded; and after stating the proceedings to the filing of the bill of revivor, alleged, that on the 30th December, 1837, the complainant being a non-resident of the State of *Maryland*, the defendant moved for and obtained a rule on the complainant to give security for costs, which has never been complied with, notwithstanding which a final decree was passed, which ought now to be rescinded, and proceedings suspended, until security given; that upon the security being given, he is ready to file his answer to the bill of revivor, and was not aware that security for costs had not been given when his appeal was entered, and has dismissed his appeal with this petition. The defendant tendered his answer.

The Chancellor permitted the petition of the defendant to be answered by the oath of the solicitor of the complainant; and on the 20th February, 1838, being of opinion that under the circumstances of this case, the rule security for costs could not have been enforced, and therefore the decree should not be set aside, because it had not been previously disposed of; and further, that the opening of the decree on the ground proposed, would as has been laid down, lead to the establishment of a lax principle of practice that would be productive of the most deleterious consequences in the administration of equitable jurisprudence.

From this order and the order of the 19th January, 1838, the defendant *Hatton* prayed an appeal, and gave bond which was approved—afterwards set aside, upon petition and proof of insufficiency, and a new bond filed.

Upon the 29th November, 1839, the auditor made his report, accompanied with a variety of accounts and statements, which were made the subjects of exception by both parties, and on the 20th March, 1840, the Chancellor (BLAND,) referred the cause again to the auditor, with directions "that in the absence of positive and direct proof of value, and where the witnesses differ in their estimates or opinion of the value of any subject involved in the account desired to be stated, an

average value is to be taken and assumed, not by the number of witnesses, but by striking an average from the various values from nothing, and the several amounts as specified in the testimony. An estimate of the rents and profits of the real estate is to be made from the testimony, in regard to its actual or capable amount of regular annual agricultural productions, including as an addition thereto, a charge for any waste that may have been committed, as by the removal of houses, the selling or taking of timber for fence rails, &c., and deducting therefrom an allowance for repairs of edifices, or by putting up fences not gathered from the land itself. All personal property given in trust by the testator, must be accounted for, and delivered up to the *cestui que trust* or plaintiff; or when it appears to have been converted, or lost by the default of the trustee or defendant, he must be charged with its value. The trustee is to be charged with the value of each slave, during the time such slave was held by him, according to the annual amount which such slave was capable of earning, without any default of the trustee, with an allowance to the trustee, for the maintenance of any such slave, during the period of his infancy or imbecility, or for loss of profit during his absence as a run-away, and also for expenses incurred in apprehending such run-away slave. The trustee may be justified in selling a slave, or in sending him abroad to be sold, on the ground of its being necessary, owing to the ungovernable nature of the slave, to save such property from total loss, and therefore the facts and circumstances upon which the trustee proceeded to make sale of any such property, must be stated by the auditor. The trustee is not to be charged with the profits of any property, during the time it was in the possession and use of the *cestui que trust*, nor during the time it may have been legally out of, and withheld from his possession. The parties are allowed the usual time to take further testimony. In regard to the agreement filed on the 13th inst., it is declared that all further proceedings under the order of the 22nd February, 1838, have been finally closed

by the order of the 31st March, 1838. All exceptions at variance with this order overruled.

On the 30th August, 1840, the auditor made a further report, with various accounts and statements, to which the defendant filed exceptions. These were overruled *pro forma* by consent, and on the 2nd October, 1840, the Chancellor (BLAND,) decreed as follows :

It appears from the auditor's report, that upon a settlement of the accounts of the defendant (*Hatton,*) as a trustee, from the commencement of his trust to the time of the death of *Mary R. Weems,* there is due from the said trust estate to the said defendant, the sum of $3,527.13, and that upon a settlement of accounts between the said defendant and the complainant, as administrator of *Mary Ann Weems,* from her death to 30th August, 1840, for the profits of the said estate, from the death of the deceased to the 19th January, 1838, and interest thereon, there is due from the said defendant to the said complainant, as administrator as aforesaid, the sum of $354.75. It is further decreed, that the said defendant hath, and he is hereby declared to have, a lien on the trust negroes now in his possession, to secure to him the payment of the sum of $3,172.38, being the difference between the sums of money hereinbefore mentioned. And that upon the complainant's paying, or bringing into this court to be paid to the said defendant, the aforesaid sum of $3,172.38, with interest on the sum of $2,661.65, part thereof, from the 30th August last, until so paid, or brought in, the said defendant (*Hatton,*) shall be and he is hereby required, to deliver to the said complainant, such and so many of the negroes mentioned in the decree, passed in this cause on the 19th January, 1838, with their increase, as shall or may at that time be living and in his possession, or under his control, together with the profits of the said slaves, from the said 19th January, 1838, with their increase, until they shall be delivered or sold, as hereinafter directed; and the auditor is hereby directed to state an account thereof, from the proof and proceedings now in the case, and from such other evidence as may be laid before him ; provided,

that such proof be taken before some justice of the peace, on three days notice as usual, and filed on or before the delivery or final ratification of the said sale, as hereinafter directed. The decree then proceeded to provide for a failure by the complainant, to pay the balance due the defendant, and for default thereof, ordered a sale of the negroes, and appointed a trustee on the usual terms and conditions, to effect that purpose. From this decree the defendant appealed.

The complainant also appealed from the order of the 20th March, 1840, and from the final decree.

The cause was argued before BUCHANAN, C. J., STEPHEN, ARCHER, DORSEY, CHAMBERS, and SPENCE, Judges.

ALEXANDER, for Hatton—

Insisted, that under the act of 1830, chap. 185, the appeal should be dismissed ; the decree appealed from was not final, nor in the nature of a final decree.   The decree of the 20th March was an order for the payment of money into court, and upon default thereof, a sale of personal property was ordered ; a further account than the one which appeared in the record, was necessary to settle the rights of the parties finally ; in such cases the right of an immediate appeal is denied by the act of 1830.   It is true the act of 1841, chap. 11, (passed on the 15th January, 1842, some thirteen days since,) repeals so much of the act of 1830, as takes away the immediate right of appeal upon such orders as the one appealed from.   But still, the last act, under the act of 1837, chap. 261, does not take effect until the 1st June, 1842.   The repealing law contains no words to show when its operation shall commence. It takes effect under the general law of 1837 only.   The second section of the act of 1841, declares, that it "shall extend to appeals already taken, as well as to those hereafter to be taken, and the Court of Appeals shall proceed to hear and determine such appeals, as if the right of appeal had existed at the time such appeals were taken."   This language, however, does not bring the case within the act of 1837—which, after declaring from what period all laws affecting, or relating to the

general administration of justice shall take effect—provides that the General Assembly "shall have the power by EXPRESS WORDS, to be inserted in any such act, to declare that the same act shall have operation on or after a different day." Now the act of 1841, chap. 11, has inserted in it no express words relating to a different period than the 1st June next— nor express words relating to any day—nor equivalent expressions. If the repealing law does not operate until 1st June next, this appeal must be dismissed, as this court then would have no jurisdiction.

The appellants further contended—

1. The decree of the 2nd day of October, 1840, is predicated on the previous decree of the 19th day of January, 1838, from which the appellant likewise appealed, and the said previous decree was improvidently entered.

1. Because at the date thereof, the rule security for costs had not been obeyed by the complainant, nor any proceeding had to discharge it.   6 *Ves. Jr.* 212.   3 *Cow.* 73.

2. Because at that date, the case did not stand regularly for hearing.   11 *Gill & John.* 426.

2. There is not sufficient evidence in the record of the complainant's title to maintain this suit.   He claims to be the administrator of one *Mary Ann Weems,* who, it is pretended, was the daughter of the complainant, and his deceased wife, and who is supposed to have since died intestate.   But the supposed evidence of the birth and death of that child, was irregularly taken under a commission, issued *ex parte,* and executed and returned without notice to the defendant, and no sort of proof whatever has been produced of the grant of administration on the estate of that child to the complainant.

3. That the decree of the 19th day of January, 1838, even if it had been regularly entered, ought to have been opened upon the application of the defendant, which was made during the term, and before enrolment of the decree, and especially, as the decree was shown to be erroneous in awarding delivery of negroes, who were shown by the proceedings, to have died before that time.

4. Upon the merits. The title to the personal property alone is in question in this suit. It is conceded that the limitation over to the appellant was dependent on an estate in tail, previously given to *Mary R. Hatton*, the appellee's late wife, or to her children, and it is immaterial to determine in whom such estate vested. It is likewise conceded, that the limitation over of the stock, plantation untensils, and household and kitchen furniture, is too remote, and therefore void. But it will be insisted, that the case of *Biscoe vs. Biscoe*, 6 *Gill & Johnson*, 364, is an authority in point to show that the appellant, as ultimate legatee, is entitled to the male negroes in being at the testator's death, and upon the principles established by that case, the appellant will also claim the female negroes in being at the testator's death, with all their subsequent increase. 4 *Harr. & John.* 441. 11 *Wheat.* 3 *Harr. & McHy.* 393. 4 *Kent Com.* 222. 6 *Gill & John.* 364.

5. That the auditor has charged the appellant with the estimated value of the stock, plantation utensils, and household and kitchen furniture, whereas there is no evidence whatever of the conversion of that property by the appellant. In the absence of such evidence, the appellee is bound to take the specific property itself, and cannot elect to charge the appellant, the trustee, with the imaginary value thereof.

6. That the auditor has charged the appellant with the estimated value of fences removed by him, whereas the evidence in the cause is not sufficient to prove any removal, as is alleged; but on the contrary, is abundant to show that the fences on the trust estate were repaired with materials procured from the trustee's own estate.

7. That the auditor has charged the said appellant with the hires or values of negroes belonging to the trust estate, for which he is not liable, as for example: for *Frank*, who is shown to have been shipped to a foreign market, and lost on the voyage—for *Louisa*, who continually waited on her mistress until the year 1832, when she died—for *Henley*, *Romeo*, and *Lantz*, who died in the year 1837.

8. That the principle of average adopted by the auditor, is

13      v. 12

erroneous, and in opposition thereto it will be insisted, that the average is to be determined by adding together the estimate of every witness, and dividing the sum of those estimates by the whole number of witnesses.

9. That the appellee has failed to show any title in himself to any part of the property. Assuming that the property vested in the children, he has not averred or proved that the child, whom he represents, was the only child left by his wife; but, in truth, the estate tail vested in the wife, and he has not averred, nor shown, that he is the representative of the wife.

J. Johnson, for *Weems* and wife—

Insisted that the act of 1841, gave an immediate right of appeal in this cause, and that the court would now hear and decide the cause, irrespective of the act of 1837. It was the clear intention of this act, that this cause should now be heard. The act applies to appeals theretofore taken, which are to be heard and determined as if the right had existed at the time of appeal taken. The words are express, that now the appeal is to be heard; they relate to a time present, which is a different time from the 1st June next. The motion to dismiss will, therefore, be overruled.

As to the rule security for costs not being complied with, the answer of *Hatton* was received under an agreement, and he was in default from the commencement of the suit until that answer was filed in 1834. He knew that *Weems* was a non-resident, and did not lay the rule for three years after his knowledge. This is a waiver. *Alex. Prac. 56. 1 Bland Rep. 561. 2 Bro. C. R.* 609.

In support of the appeal, on the part of the complainant *Weems*, he insisted—

1. That the limitation over to the defendant, *Henry D. Hatton,* of the property, real and personal, given to him by the will of his father, *Henry Hatton,* in trust for his sister, *Mary R. Hatton,* (afterwards *Mrs. Weems,*) was too remote and void. 4 *Kent Com.* 222. 1 *Harr. & Gill,* 111. 7 *Harr. & John.* 220. 3 *Gill & John.* 199. 6 *Gill & John.* 232.

2. That if the said limitation was good, still, as *Mary R. Hatton* did leave lawful issue living at the time of her death, the contingency upon which the limitation to the defendant was to take effect, did not happen, and consequently he has no title to the property.

3. That the order of the 20th March, 1840, so far as it directs that the average should be taken, according to the various values placed by the witnesses upon the subjects involved in the accounts, established the true rule.

4. That the said order, however, was erroneous, as was the final decree of the 2nd of October, 1840, in allowing the defendant a larger sum for taking care of the trust property, and supporting the *cestui que trust*, than the income or profits of the estate amounted to. 1 *Sch. & Lef.* 14 *Ves.* 499. 6 *Ves.* 473. 2 *McCord*, 55. 24 *Law Lib.* 229. *Chan. Rep.* 158.

5. That the said order and decree were also erroneous, in allowing the defendant any thing for the preservation or care of the trust property, or for the loss or destruction of any portion of it after the period when he was bound to have surrendered up the possession of it.

McMahon, also for *Weems*, in reply upon *Hatton's* appeal.

It is said the decree was prematurely obtained during the pendency of a rule security for costs not complied with. If the bill discloses the fact, that complainant was a non-resident, then the knowledge of the defendant is conceded. If after this, he takes any step in the cause, conceding the complainant's right to a standing in court, the right to enforce the rule is gone. *Mit. Ca.* 55, 56. 3 *John. C. R.* 520. 1 *John. C. R.* 202. 12 *Con. Ch. Rep.* 501. 2 *Bro. C.* 609. But the rule here is a nullity, from the mode of obtaining it. The right to the rule does not depend on change of title in the prosecution of the suit, but upon the original rights of the defendant. Amendments change title with reference to the subject matter—do not give new rights to the rule. They are no revival of the rule. A party in default and in contempt cannot lay a rule. 3 *Equity Digest*, 271. Process for

want of appearance and answer, is a bar to the rule. After the rule laid, an appeal is a waiver. The commission had lain an entire term before decree. Then had the Chancellor a right to decree in vacation, after the evidence had so lain. 7 *Gill & John.* 87, 379. An answer admits the right to revive. *Mitf.* 353. 2 *Simon* 465. 2 *C. C. R.* 501. 11 *Price Ex.* 58. 5 *Eng. Con. Ex. Ch.* 58. After revivor, the defendant cannot put in new matter, and make a new defence. *Alex. Prac.* 105. 11 *Price,* 117. 1 *Ry. & Myl.* 28. 1 *Hoffr. Pr.* 180.

The act of 1820 does not enlarge the right to file an answer.

R. Johnson, for *Hatton,* in reply upon his appeal, and upon the appeal of *Weems.*

The act of 1841 does not take effect until the 1st June next. 6 *Bro. P. C.* 557. 1 *Kent Com.* 457.

Under the act of 1820, chap. 161, after a return of an *ex parte* commission, the cause is to be proceeded in, as if the commission had issued after answer filed. The commission must lay a whole term. *Md. Ch. Prac.* 112. "To shew cause," is to be heard at the term next succeeding that to which the commission was returned. 7 *Gill & John.* 281. The commission here was returned to December term; but in the recess of two terms. In point of law, the cause was not for hearing until March term. The decree was passed too early. The rule security for costs was laid on the docket. Why was a petition and affidavit necessary? If the non-residence appears on the bill, the rule goes as of course. If it appears on the proof, why may it not also be granted? As the rule was passed, there was no right to dispense with it, and pass a decree without notice. Upon the effect of the devise to *Mrs. Weems,* as regards herself, and the devise over to her child and the defendant, the counsel cited—7 *Harr. & John.* 220, 236, 244, 247. *Cro. Jac.* 590, 246. 1 *Harr. & Gill,* 115. 3 *Gill & John.* 199. 2 *Harr. & Gill,* 42. 6 *Gill & John.* 232. Treated as a devise of negro men and women, living at the death of the testator, it is valid as an executory

devise. *Briscoe's* case, as reported, does not mean a failure of issue at the death of the first taker; but a failure of issue at the death of the subject of the devise, which is an event within the prescribed limits. As the devise over is a life in being, the words without lawful heir are not too remote. 1 *P. Wms.* 663. 1 *Harr. & Gill*, 115. 4 *Harr. & John.* 441. 3 *Harr. & McH.* 393.

On the third point of the appellant's, the counsel contended, that the decree ought to have been opened during the term, as applied for. The 3rd section of the act of 1820, conferred an absolute right to file an answer. The Chancellor had no right to determine *in limine* what sort of an answer would be filed. The dismission of our petition deprives us of the right conferred by the third section of that act.

McMAHON, in reply upon *Weems'* appeal.

The decree in this cause leaving nothing open—the principal rights all settled—there was nothing left to be enforced except incidental profits of the personal property arising after the decree. It is, therefore, final. So a sale of mortgage property is final. The existence and accrual of consequential rights, cannot differ the question. The act of 1841 is inconsistent with the act of 1837, and the fullest effect must be given to the last act. The act of 1837 was to remedy mischiefs as to future legislation. It has no relation to past legislation. But the act of 1841 speaks of decrees heretofore passed. It speaks backward to the time of appeal, and gives the right. It was intended to ante-date and benefit appeals taken, and to be taken, and to cover all cases. The only object of the construction contended for, on the motion to dismiss, is to bring the appeal back again. The act speaks of all classes of appeals depending and to be prosecuted, and left open no chasm or period under the act of 1837.

The cause was referred to the auditor, and hence the defendant had no right to file an answer.

Then who has the right to administer and distribute the personal property of a deceased wife? At common law, the

husband.    The right of administration is decided by the *locus* of the property.    The husband takes it as administrator—he is liable as administrator, liable of course to payment of her debts.

The estate which *Mrs. Weems* took under her father's will, is not an estate tail by implication.    It is an estate to her for life—remainder to her child in fee, and if she dies without child, then a remainder over by way of executory devise. This disposes of the whole case.    All limitations over are defeated by the birth of her child.    The limitation is, that if she have no child.    1 *Harr. & Gill*, 116.    The construction contended for on the other side, changes the terms of the will. This will puts real and personal property on the same ground and intent.    The testator designed no separation.

As to the accounts, by the views on the other side, the longer this estate remains in trust, the worse it gets, and ultimately the whole estate gone, with the maintenance of the *c. q. t.* to boot.    On this subject the counsel cited—1 *Vernon*, 254, *note*.    2 *Sch. & Lef.* 34.    2 *Jacob & Walker*, 253. 6 *Ves.* 473, *particularly*.    1 *Ball & Beatty*, 240.    2 *Nott & McCord*, 57, 199, 211.

These cases relate to executors, guardians, trustees of infants, where one party is under the care of another; to guard against abuses.    Trustees, in such cases, not permitted to exceed the income entrusted to them, but by permission of a court of competent jurisdiction.    The record shows the tenant in tail, in this case, was a weak-minded, helpless woman, an imbecile dependant, who did not know that the charges now made would swamp her whole estate.    She was peculiarly a ward of court, and no vouchers are produced.    A trustee dealing with trust property, is bound to account fully and particularly.    He cannot expend all the money and profits of his *c. q. t.*, and claim for greater expenditures out of her estate.

ARCHER, J., delivered the opinion of the court.

On the motion to dismiss these appeals the court are divided in opinion, and the motion to dismiss cannot, therefore, prevail.

We shall proceed to examine the questions which have been submitted on the appeal.

The appeal from the decree of the 2nd day of October, 1840, brings up not only that decree for examination, but the decree of the 19th of June, 1838, and the order of the 20th February, 1838.

Objections have been made on the merits which are common to both decrees, and objections have also been made to the regularity of the decree of 1838.

Two objections have been taken to the decree of 1838, and it is therefore said to have been improvidently entered.

1st. Because at its date, the rule security for costs had not been obeyed by the complainant, nor any proceedings had to discharge it.

2nd. Because at the date of the decree, the cause did not stand regularly for hearing.

The *first* question we shall examine hereafter, when we shall come to consider the Chancellor's order of the 20th February, 1838. Our views on the *second* question, renders the examination of the first in this place unnecessary. We believe the *second* objection to be decisive against the validity of this decree.

By the decision of this court, in *Palmer & Hamilton* vs. *Oliver's Ex'trs*, 11 G. & J. 426, in which, like this, there was an interlocutory decree, and an *ex parte* commission, it was determined that the decree was irregular, and liable to reversal, according to the true construction of the act of 1820, chapter 161, unless before decree, the commission had laid in court one entire term; and it was further decided in that case, that the commission, in the language of the act of Assembly, should be issued, proceeded in, and returned in the same manner, and that the court should proceed to a final decree in the same manner, as if the defendants had appeared and put in their answers. Has the court in this case, proceeded to a decree in the same manner, as if the defendant had appeared and answered? According to the established and uniform practice of the Court of Chancery, where the defendant appears and answers, the

case is brought to issue, and a commission issues and is returned, it lies one whole term, before, by its rules, it is ready for decree. The same rule, as we have seen, is applicable to a final decree, taken under an interlocutory order and commission, under the act of 1820, chapter 161. And the question is, has the commission laid in court one whole term? This involves the enquiry, what is a term of the Court of Chancery, and its duration, according to its rules and practice? The *September* term commences on the fourth Tuesday of September, and terminates on the first Tuesday in December following, when the *December* term commences, and continues until the second Tuesday in *March*.

The commission was returned on the 20th of November, 1837, (during the *September* term,) and the case was laid before the Chancellor, by the defendant, on the 19th day of January, 1838, during and before the close of the December term. The decree having been made before the commission had laid one whole term in court, was made at a period when it could not rightfully have been made, and was therefore irregularly and improvidently entered. But if the above views were wrong, it is still certain that the decree was improvident, upon the ground, that it was presented to the Chancellor for decree after the termination of the sittings of that court, as of December term. By the rules of the Chancery court, the sittings commence with the commencement of the December term, and end on the third Tuesday of January, which, in the year 1838, happened on the 18th day of *January*. If the cause had been ripe for decree, it might have been called up and argued, or submitted at any time during the sittings; but not after the sittings are over, without consent. That was done in this case; so that upon either ground, the Chancellor's decree of January, 1838, was improvident, having been passed at a time, and under circumstances, not authorized by the act of 1820, chap. 161.

The next subject for decision, is the question as to the correctness of the Chancellor's order of the 20th of February, 1838, dismissing the petition of the defendant, praying that

the decree of 19th January, 1838, may be set aside. The petition sought that the decree might be set aside upon the ground, that the petitioner had, on the 30th of December, entered on the docket a rule security for costs, and that this rule was not disposed of when the decree of 19th January, 1838, was passed. The petitioner does not propose to file his answer, but states he will do so if the decree be set aside, and he concludes his petition with a prayer, that the decree may be set aside; that complainant may give security for costs, and that within a limited time thereafter, he may be permitted to file his answer. The Chancellor dismissed the petition upon the ground, that the rule security for costs could not be enforced; that its previous disposition was immaterial, and that to gratify the petitioner, would lead to a lax practice, injurious in its consequences.

We are of opinion, with the Chancellor, that the rule security for costs could not have been enforced. The rule was entered on the docket irregularly. The practice of the Court of Chancery in this respect, is well stated in 1*st Bland's Ch'y.* 561, to be, that when the non-residence of the complainant appears by the bill, such a rule may be laid on the docket during the sittings of the term. But that where the non-residence of the complainant does not appear on the face of the bill, the matter must be brought before the court by petition, and a special order obtained. In this case the non-residence did not appear by the bill; the matter was not brought before the Chancellor by petition, and the rule on the docket was wholly irregular. The defendant was in default for not appearing and answering, and while he was so in default, he could not lay a rule security for costs. He waived, moreover, the right to demand security for costs, by praying an appeal; the settled doctrine being, that any proceeding in a cause, recognising the complainant's right to sue, takes away the defendant's right to have security for costs.

But again, on the 16th March, 1834, the defendant filed his answer to the application of the complainant, for a receiver, in which his knowledge of the non-residence of the complain-

ant is admitted; and after that, on the 14th of August, 1834, he files his petition to the Chancellor for a sale of some of the negroes. It is very certain that this proceeding would, according to the authorities, have prevented the defendant from demanding afterwards, and before the bill of revivor, security for costs; and we think it would equally prevent such an application after the filing of the supplemental bill of revivor, for that is but a continuation of the former suit, with not a different complainant, but the same complainant, reviving the suit, as administrator of his daughter.

But it is urged, that although the rule may have been irregularly laid, and that although the defendant may not have had a right to the rule, still the rule having been laid, it should have been disposed of before the decree of 19th January, 1838, could regularly pass. We think, however, differently; there could be no reason to set aside a decree otherwise correct, merely to put out of the way an order which must necessarily have been disposed of. The whole effect of such a proceeding would be, to set aside the decree, to get rid of the rule, and then decreeing again. The petition cannot be considered as an application to the Chancellor to file his answer, for that he only proposes to do, upon the rule security for costs being enforced. What the Chancellor, therefore, has done, cannot be considered as a rejection of the defendant's answer, nor can it be said that the course of the Chancellor in dismissing his petition, defeated him in filing his answer to the bill of revivor, for the decree of the 19th January, 1838, was either a final decree under the act of 1820, chap. 161, or it was not. If it was a final decree, he had no right under that law, and in the circumstances of his case, to file an answer; if it was not a final decree, within the meaning of that act, the law gave him the right of filing his answer, which he has not asked or tendered, but upon condition of the decree of 19th January, 1838, being set aside. We are therefore of opinion, that the Chancellor was right in his order of the 20th February, 1838.

We shall now proceed to examine the merits of the case.

The complainant claims the rents and profits of the lands, in right of his wife, or in his own right, and the personal property, as the representative of his deceased wife, or in virtue of his administration on his daughter's estate.

We differ with the Chancellor, in his construction of the will of *Henry Hatton*, and believe that by its true construction, *Mrs. Weems* took an equitable estate tail, which, in this State, is converted into an estate in fee in the lands devised to her; and that in the personal property she took an absolute estate, and that the limitation over to *Henry Hatton*, being after an indefinite failure of issue, is void. This construction of the will as regards the limitation over of the stock, plantation utensils, and kitchen furniture, is not denied; but it is insisted, that the case of *Briscoe & Briscoe*, 6 *Gill & John.* 232, is an authority to shew that he is entitled to the male negroes, and also the female negroes and their increase, and at all events, to the male negroes.

The court, in their determination of *Briscoe & Briscoe*, refer to the case of 4 *Harr. & John.* 441, *and* 4 *Harr. & McH.* 393, and do not overrule them; but distinguish them from the case then before the court, by the character of the subject matter of the bequest. These latter cases are decisive of the right of *Mrs. Weems* to the negro women, and their children and increase. Did the testator mean a definite or indefinite failure of issue, as the event upon which the ultimate legatee was to take? These cases are decisive to shew, that where the subject of the bequest is a woman and her increase, that the testator meant an indefinite failure of issue. Such terms are used in this clause, and are decisive of the right of the first taker to the women and children; the men are contained in the same clause, and the same intention must be considered as applicable to them; for he clearly meant that all should go over on the same event, and not that one portion of the bequest should go over on definite, and the other on an indefinite failure of issue. He could not, and clearly did not, mean to separate them, as would be the case upon the construction contended for.

If it be said that the intention in the clause of the will under consideration, by the bequest of men, was to indicate a bequest to the ultimate legatee, on a definite failure of issue, the intention is equally strong by the bequest of women and children to shew, that he meant an indefinite failure of issue.   In such a case there would be no preponderating circumstance to show that the testator meant a definite failure of issue, and the limitation would, therefore, be considered as resting entirely on the legal extent and import of the words, *"if she die without lawful issue, to have the same;"* and in that event, there could be no question but that the limitation would be too remote, and void.   Such being the construction of the will, and the rights of the parties, it becomes our duty to inquire into the charges which should be made against the defendant, and the allowances which should be made to him for expenses of the trust, and for its management.

According to our laws, a guardian cannot encroach on the capital of his ward's estate, without the order of the Orphans' court; nor can the real estate be diminished but by the approbation of the Court of Chancery; nor ought a trustee to encounter expenses impairing the principal of his *cestui que trust's estate*, without the approbation of a Court of Chancery, to which he should at all times appeal for his guidance and direction in the administration of his duties.   What expenses, however, he has necessarily encountered, and which can be clearly and satisfactorily seen by the court, he ought to be allowed, as the court, on application at the proper time, would have allowed them.

But in making such allowances, the court must be careful that, in indemnifying the trustee, they do no injury to the *cestui que trust*.   If the trustee has kept regular accounts of the expenses of the trust, so that they could be clearly seen and known, there could be no difficulty.   But if he has mixed the property with his own, and kept no account of the products of the labor of the slaves, nor any account of the expenses of the clothing of the negroes, or of the clothing of his *cestui que trust*, then by his own conduct he has thrown over

these matters an obscurity, which he might and ought to have avoided, and to prevent injustice being done to the *cestui que trust.* The consequences of such obscurity should be visited upon the trustee, and he cannot complain if those expenses are set down at the lowest estimate. Such has been the conduct of the trustee in this case. He has furnished us with not a single account of any kind or description, of the value of any clothing furnished the negroes of *Mr. Weems.* He has kept no account of the crops raised by the negroes, or of their hire; but has taken them himself, and worked them himself, with his own slaves, whereby real difficulty has arisen in doing justice to the parties. It appears that from the death of *Mr. Hatton,* up to the period when the accounts taken by the auditor are brought to a close, averaging the evidence given of the value of the labor of the slaves, and of the lands left by the testator, as estimated, and making the allowances claimed by him for compensation, alleged expenses for board and maintenance, it is manifest, that in a few years the trustee would consume the whole trust property. The principles upon which such a claim rests, cannot be well founded; and the claim cannot be sanctioned to the extent to which it goes, without overturning established rules. Had the defendant been a guardian, instead of trustee, he could have only been allowed commission to the extent of 10 per cent. on the income of the estate. In the case of *Ringgold & Ringgold,* 1 *Harr. & Gill,* 11, the trustee was allowed commissions by way of compensation or indemnity, in analogy to executors, administrators and guardians, and if compensation be made to the trustee in this case, in analogy to the commissions allowed either guardians, executors, or administrators, it will be found, that he has been allowed in this case a sum much beyond that amount.

With regard to the expense of raising the negroes, it is a striking fact, that in 1834, when there were as many children, subjecting the trustee to expense, as at any other time, the receiver was subjected to no other expense on account of the children, than to the loss of the hire of the mothers of the

children, and that the defendant agreed to take one of the women, who had the greatest number of children, and her children, free of expense to the estate; yet notwithstanding this, when the property, during the same year was re-delivered to the defendant, allowances are made him in the account for the maintenance of the children. Eight witnesses are examined to prove, when in their judgment, a child ceases to be expensive to his master, and what would be a fair price for the maintenance of a child; and a rule for averaging testimony has been applied, and made the basis of the allowance to the trustee. This is a rule adopted by the Chancery Court, for attaining justice, where the record furnishes no other means of arriving with more certainty at the truth. But like every other rule, it must have exceptions, and cannot with propriety be capable of universal application. We think the case before us furnishes an exception. Suppose the trustee had for half the period of the trust, hired out the mothers, with their children, so as to be no expense to the estate, would it not be stronger evidence of what the maintenance of them would be for the residue of the time, than the opinions and conjectures of witnesses, who vary in such opinions, of the annual expense of each negro, from five to twenty dollars. We think in such a case, the rule of average should be disregarded, and so we think, the fact that the receiver has been able, at so little expense, to take care of these children, is better proof than can be derived by the adoption of the general rule, and the more especially, as the defendant, by taking the most burthensome family on such terms, has admitted virtually the correctness of these views.

So too with regard to the board and clothing of the *cestui que trust*. We think we perceive in the record, a better guide than the rule of average. Ladies in the neighborhood have been boarded for one hundred dollars, and clothed for one hundred dollars, and indeed for a less sum; and a witness, whose occupation is that of taking boarders, proves that he could board and lodge a lady for one hundred and twelve dollars. Evidence of this character, on the supposition that credit is to be

attached to the witnesses, is a better guide to truth and justice, than the opinions of those, whose occupations or experience do not give them practical knowledge of the value of boarding. We shall, however, make a higher allowance for *Mrs. Weems'* board and maintenance, than the above remarks would seem to indicate, as it is fully proved that her attire was more costly than was common. We think, in this view of the subject, and considering that *Mrs. Weems* was his sister, and it is proved that the board of a sister would not be so valuable as of a stranger, we think we shall make a sufficient allowance to the defendant, by directing the same to be credited to him at two hundred and fifty dollars per annum.

From the considerations above stated, we shall allow annually for all expenses of the trust, the difference between the amount of *Mrs. Weems'* board, and the whole income of the estate annually; or in other words, the sum left of the annual income of the estate, both real and personal, after deducting from the same, the amount of the board, the account will thus be taken to the marriage of *Mrs. Weems;* after which the board must cease, as a credit to the defendant; and he will continue to be allowed annually, out of the income, the same amount for expenses, as were allowed before the marriage of *Mrs. Weems.*

The defendant, as a compensation or indemnity, for his care of the estate, must be allowed commissions, according to the rule heretofore laid down by this court, in *Ringgold* vs. *Ringgold,* 1 *H. & G.* 11. Under ordinary circumstances, we should have been disposed only to allow him the lowest commission, but it has been a trust of long duration, and we will therefore allow him *seven and one-half* per cent. commission on the income of the real estate; and *seven and one-half* commission on the income of the personal estate, and the value of the personal estate as it came to his hands. Some of the negroes have died. Their annual value must be deducted from the charges against him. *Louisa,* from the marriage of *Mrs. Weems,* and *Henley, Lantz* and *Romeo,* from two months prior to their respective deaths. Credit must also be allowed for

*Frank,* and for *Hanson's* services, from the periods when the trustee lost their services, according to the account of the auditor, as stated in the record.

We think the auditor has rightly charged the defendant with the stock and farming utensils, under the circumstances of the case, and he has rightly assumed, that they have been converted by the trustee.

The only remaining question for consideration, is the right of the complainant to sue for the property of his wife, in his own name. We think this right is conferred upon him expressly, by the act of 1798, chapter 101; just as if he had administered. Whether he be entitled, by the laws of *Tennessee,* to this property, it is not important to inquire; if he should not be, he would then recover, as trustee, for the benefit of whomsoever might be interested.

According to the above views, it would seem to be unnecessary to say any thing with regard to the admissibility of the evidence of the letters of administration, which are referred to in the supplemental bill of revivor; because we believe that the whole personal property, and the rents and profits of the land, can be recovered by the husband, as we think he acquired rights over both, by marrying his wife, and by having issue born alive. The *Tennessee* commission establishes the fact, that *Mrs. Weems* had a child born alive. We shall, therefore, decree an account to be taken to this time by the auditor, and shall decree the payment over to the complainant, of the balance, if any shall be found due, and the delivering over of the negroes and slaves who are now in being, and in possession of the defendant.

As each party has, to some extent succeeded, and the decree will be modified and reformed, we shall decree that each party shall pay his own costs in this court.

In conformity with this opinion, this court directed the auditor of the Court of Chancery to state further accounts between the parties, and on the 2nd March, 1842, decreed: 1st. That there was error in that part of the Chancellor's decree of the 2nd October, 1840, which ratified the auditor's report

of the 2nd September previous, and reversed the same, so far as it ratified said report, with costs in the Court of Chancery to *W. L. Weems.* 2nd. That the auditor's report, made to this court, be ratified, and that *H. D. Hatton* pay, &c.; and 3rd. That the said *H. D. H.* surrender and deliver up to the complainant *W. L. W.*, such and so many of the negroes mentioned in the decree passed by the Chancellor in this cause, on the 19th January, 1838, with the increase of the females, as may now be living. 4th. That the cause be remanded to Chancery; that the necessary orders may be there passed, for the purpose of compelling a compliance with this decree, so far as it relates to the delivery of the property hereby decreed to be delivered; that the part of this decree which relates to the payment of the money, may be enforced by process from *this* court, and that each party pay his own costs in this court.

DECREE REVERSED IN PART, AND CAUSE REMANDED.